Thank you and good morning everyone. We have four cases on the call this morning. The first case is number 1-2-2-0-2-2. Sienna Court Condominium Association versus Champion Aluminum Corporation of BV Associates and others on agenda number 12. Counselor, are you ready? You may proceed. Good morning. May it please the Court, Counsel. My name is Kim Jansen. I am here today on behalf of the Masonry Contractors, along with my colleagues Stephen Bonanno and Annie Kuyum-Chan. I am joined today by Mr. Christopher Goodsnyder on behalf of BV and Associates. He will be presenting a portion of the argument today, as well as Mr. Christopher Cano, who represents Metal Master, Roof Master, one of the other echelons. This case involves a split between the first district on the one hand and the second and fourth districts on the other over whether the implied warranty of habitability in the construction of a new home should be extended beyond the builder or developer vendor of the new home to impose duties on subcontractor defendants who are not party to the contract of sale. In addressing that portion of the question, I'm going to focus on why the duty that arises by virtue of sale, why the economic loss doctrine precludes converting it into a tort-like duty for imposing liability, and why the policies that this Court has recognized for the implied warranty do not justify an expansion beyond the builder, developer, vendor to downstream subcontractors. Mr. Goodsnyder will then address the particular factual and procedural history of this case as it applies to these issues, as well as why if the implied warranty is to be expanded to subcontractors based on the insolvency of a builder or developer vendor, that the better test would be a no-recourse test rather than a lack-of-solvency test. So beginning with the question of duty and why that duty must be rooted in the underlying sales contract, and that takes us all in which this Court first recognized the implied warranty. In that case, this Court recognized that the implied warranty arises by virtue of the execution of the sales contract. It is a corollary to the covenant to convey as part of that contract. And although it's independent, it's not a strict breach-of-contract type claim, it arises out of that contract. That's where the duty arises. Now, the First District and the plaintiff in this case looked to Rogarowitz as effectively severing the implied warranty from the underlying sales contract. And in Rogarowitz, this Court did in fact acknowledge that the implied warranty has an existence independent of the contract. It's not strictly tied to the contract. And this Court held that privity was not required in that case for a party, not the original purchaser under the sales contract, but a second or subsequent purchaser was permitted to enforce the implied warranty against the builder or developer vendor. Now, the First District and the plaintiff in this case read that as essentially eliminating the relevance of the underlying sales contract, that it's just a pure policy-based duty that is imposed on builder-developer vendors and, in our argument, on subcontractors as well under certain circumstances. But this Court explained and thought of UBIM that Rogarowitz can't be read that broadly. Rogarowitz did not eliminate the relevance of the underlying sales contract. The expansion of the implied warranty in that case was justified specifically because expanding liability to permit enforcement by a subsequent purchaser did nothing to alter the obligations that the builder or developer assumed under the original sales contract. It held them to nothing more than they were if the builder and developer remain solvent, if they have assets from which a homebuyer can obtain recourse, that a subcontractor has no liability under the implied warranty. So the natural extension of that is that if liability is then imposed on subcontractors by it's inescapable that you are now imposing an obligation on subcontractors beyond what the obligations that arose from the original contract and, in fact, subcontractors have no obligations under the original sales contract because they're not pardons to that contract at all. Now, Plainiff argues that the implied warranty should be expanded beyond the contract to permit liability, to impose liability on subcontractors based on tort-like concepts of relative culpability. And it was only responding to that argument before this Court that it really kind of clicked to me why the contract is so important to the implied warranty. And that's because this Court has long recognized that a distinction between tort claims and contract duties for purposes of the economic loss doctrine. Under the economic loss doctrine, claims arising in tort that are purely for solely economic loss are barred. So the economic loss doctrine distinguishes the duties that arise under tort and the duties that arise under contract. Contract duties relate to the disappointed expectations of a purchaser. Disappointed expectations with respect to the quality of goods or the quality of services if it's a service contract. That's the type of claim that plaintiffs are trying to bring in this case. They're disappointed with the quality of their new home construction. Because of that, a duty cannot be imposed on subcontractors or the builder, developer, vendor, or anyone else under a tort-like theory because the economic loss doctrine precludes tort claims for purely economic loss. Hasn't the Court recognized liability, tort liability, in matters where one party to the commercial transaction has a expertise or a knowledge that the other party to the contract could not have? So, for example, obviously professional malpractice, appraisers, etc. In other situations, the Court has understanding the economic loss doctrine. However, determined that this imbalance of knowledge means that there can be a duty, a special relationship of sense. I don't mean that as a term of art, but a relationship such that a duty, a tort duty would be imposed on one party. So, in that context, that's one of the exceptions that this Court has recognized, the negligent misrepresentation concept. If the homebuyer were relying on information provided by a subcontractor in making decisions related to its business transactions, that would be an exception, a economic loss doctrine. But here, there is no relationship whatsoever between the homebuyer and the subcontractors. They're not communicating about decisions. The homebuyer communicates with the builder or developer vendor. The builder or developer vendor, in turn, approves the plans drafted up by the design professionals, selects the materials provided by material suppliers, provides specifications and plans for the subcontractors to follow, and the builder directs the subcontractors in how to perform the particular task that that subcontractor is contributing to the construction. Is the Minton decision properly before this Court, since it comes by way of a certified question? I believe so, because the certified questions, each of them is framed in terms of how the Minton exception should be applied. But, of course, before this Court can decide how the Minton exception, recognized by the 1st District and rejected by the 2nd and 4th Districts, before this Court can decide how to apply that exception, this Court has to first determine whether that exception, in fact, should be applied. And if we agree with you that Minton is wrongly decided, is there anything left to answer? Do we have to go any further? No, you do not. Following just that idea of Minton, Minton has been the law in the state for 25 years, right? Within the 1st District, it has. The 2nd and the 4th Districts... Let me get my chronology correct here. Layman came first out of the 4th District soon after Minton in 1985, so almost as long as Minton. The 4th District said, that rationale doesn't make sense. If a subcontractor is going to be deemed to have impliedly warranted the quality of its work, that warranty should exist regardless of the financial state of a builder, developer, vendor. Either you've warranted your work or you haven't. And Layman is almost as old as Minton, so we've had this conflict for quite some time. So, one of the primary reasons that the economic law section is so important is because it's there to protect the freedom of the parties to contract, to bargain over the terms of any warranties that they do or do not extend. And in a situation like this, where the subcontractors aren't party to the original sales contract, they don't have that opportunity. They don't have the opportunity to bargain with the home buyer over the limits of any warranty that might be implied. And under the 1st District's precedent, they're not even allowed the protection of a bargain for disclaimer of the implied warranty that the builder or the developer may have bargained for. At the end of the day, we get down to the underlying policy behind the implied warranty of habitability. And plaintiff, of course, focuses on the policy of protecting the innocent purchaser of a new home. Certainly, you know, that's an interest that's worthy of protection, no question there. The problem is that protection, it can't simply just be imposed on any of which defendants, you know, willy-nilly. There has to be some sort of connection, some sort of basis to justify requiring a particular defendant to be responsible for protecting the innocent purchaser's expectations. And as far back as Peterson, this Court has recognized that the appropriate basis for imposing that obligation and the reason why it's imposed on the builder or developer is because of the unusual dependent nature of the relationship between the builder or developer vendor and the home buyer. So the home buyer looks to the builder or developer to manage the construction, to make the decisions, to supervise the work and ensure that the final end result is a structure, you know, fit for habitation, fit for the purposes for which it's built. The builder selects the subcontractors on the job. The builder selects the material suppliers who provide the materials, selects the design professionals who provide the architectural drawings and other design specifications. The builder or developer approves the plans, approves the specifications, directs the work being performed by the subcontractors, tells them what to do and how to do it. And at the end of the day, supervises and inspects and improves the work done by subcontractors and material suppliers and design professionals. The home buyer is not dependent on the subcontractors or material suppliers or design professionals. They don't have a relationship that's dependent on those entities, but they're dependent on the builder. And in fact, the subcontractors aren't similarly dependent on the builder because they're looking to the builder to provide the design and the plans and the specifications that they follow. They're relying on the builder to be the one that inspects and supervises and approves the work at the end of the day before the structure is complete. Two final points on that. In Minton and the cases that have since followed Minton, the implied warranty is extended on very narrow terms. It's extended only to subcontractors, not to material suppliers or design professionals. And it's extended to subcontractors only in limited circumstances where the builder or developer is either insolvent or does not provide recourse to the home buyer. Neither of these distinctions really justifies imposing duties on subcontractors. For one, there's no real basis to distinguish if you're going to expand the implied warranty beyond the original builder or developer vendor to anyone. There's no reason to distinguish between subcontractors and any of the other different entities that are involved in the construction. They're not doing, you know, the appellate court, the first district, that it's because they're involved in the physical work. But it's not clear why physical work versus drafting of plans versus providing the physical materials should make any difference in terms of whether a duty is supplied, whether defects in their performance created a problem in the construction, why that should be relevant. And there's no real basis to, oh, I see I'm out of time. Thank you. Good morning. May it please the Court, Chris Goodsnyder on behalf of the Appellants and Subcontractors. What you heard from Ms. Jansen essentially offered a view from 30,000 feet, and I'd like to offer a view at ground level because I was involved in the trial court litigation from the original outset, the first court appearance through the drafting of the motions to dismiss. So first I'd like to turn to highlight some of the allegations in the plaintiff's complaint because I think it's very pertinent. In the third amended complaint, which begins at Common Law Record C-5478, in paragraph three the plaintiff goes to great length to discuss the fact that the developer in this case was a single-purpose LLC. And they offer that, I suppose, as context for their pleading, but it's very pertinent in this particular case because we get into a public policy argument about the likelihood of these events occurring and leaving homeowners essentially in a position of having a problem with their property and having essentially the no recourse, which is the thrust of what we're talking about here. But as designed, the TR Siena LLC, the sole asset that it had was this project, and as the plaintiff concedes in their own pleading, that's essentially how all of these projects are structured. So what you have here is if the project is successful, then the developer and the owners of the developer profit from that project. Or if in this case there's a problem with the project or market forces, this project was done right around the same time as the economic collapse in 2008. Some other forces came into play. Perhaps the project failed and the TR Siena entity is taken bankrupt, as is the general contractor. The other key allegation in the Second Amendment complaint appears at the conclusion to Count 1, which is addressed to TR Siena, and that's the damages count. And Paragraph 67 of Count 1 says, as a result of TR Siena's breaches of its contracts, Siena Court has incurred damages in excess of $2.5 million in costs to repair and remediate the defects in the two buildings. The key issue that I'd like to address is that in this case, although the plaintiff doesn't make any disclosure in their 2014 pleading of the fact that they had recovered $308,000 from the warranty fund set aside, there's no reference to that in their pleading as a disclosure of, we have $2.5 million in damages, but we already have received $308,000. Then we have, through the discovery process, we learned that there's two insurance policies that are for the developer and the general contractor, each with a single incident of coverage of $1 million, and an aggregate of $2 million. So there's an additional $308,000 of the warranty fund, plus a potential of another $2 million in insurance coverage available to the plaintiff. And here we have the plaintiff having pled what was originally pled as a verified complaint, that their damages are approximately $2.5 million. So here in the context unique to this case, but pertinent to the test of insolvency, the appellate court elected to go purely on essentially a bankruptcy court analysis of the fact that they had filed for bankruptcy and that they had been discharged, and completely ignored the fact that the plaintiff had gone in, lifted the stay pursuant to the Illinois Insurance Code, to access the $2 million in insurance coverage, and they had brought in 2010 a motion to lift the stay to access the $308,000 of the warranty fund. So really the focus of our position is that recourse, if the court's inclined to essentially keep the concept, the mitten concept of potential downstream liability to the subcontractors, having in this case the appellate court already allowed the design professionals who made the selections of most of the items that were installed at the building, they're out and the material suppliers are out, and we're just left with, as Ms. Jansen spoke to, the sort of hands-on construction professionals. The appellate court really focused its analysis on the ease of applying the test of insolvency and essentially saying if you file a federal bankruptcy court, you must be insolvent, and ignoring the fact that in this case and in potentially many more cases, the plaintiffs have recourse to a substantial portion. According to my math, it's about 92% of their potential damages they could recover against these three sources, the $308,000 they already have that was undisclosed in the complaint, as well as the two insurance policies. So we have other scenarios where you would have an entity that isn't technically bankrupt, but only has a very limited amount of money in its bank account. That wouldn't give the plaintiff homeowners the ability to go after the subs, but they could get a small, tiny fraction of their recovery, cents on the dollar, because the general contractor and the developer have limited assets, nowhere near what it would take to satisfy a potential judgment, but technically they're not insolvent. So it's- Mr. Goodstein, your time has expired. If you would wrap up, please. Yes. In essence, the final point would be that if the court is inclined to move forward and allow Minton to stand, I would just ask that the assets, the warranty fund, and the availability of insurance proceeds be considered assets of a developer and a general contractor considering the test of recourse. Thank you very much. Thank you. Good morning. My name is Hal Morris. I represent the Siena Court Condominium Association. May it please the court and counsel. In actuality, what I represent is not an association, but 111 Illinois homeowners, but more importantly, all of the new home purchasers in this state. If this court were to rule, as suggested by the subcontractor defendants, the very strong public policy to protect what is quite candidly, though it sounds somewhat odd in a court of law, the American dream of homeownership would be substantially and seriously subverted. The goal of protecting homeowners has been a goal that both has been articulated by this court and the appellate courts for a number of years. Indeed, as noted a few moments ago, the Minton decision, which was in 1985, has stood unchanged and unrebutted by this court or by legislation for 35 years. Actually, I did the math wrong, for 33 years. Consequently, to go as the subcontractors suggest would do an injustice to that public policy. The suggestion that Minton should be overruled certainly exceeds the Rule 308 questions. Moreover, the suggestion that the trial court and the appellate court in this case did not consider the questions of possible but not necessarily recoverable insurance or the warranty fund is belied by the certified questions themselves. Certified question two and certified question number three both specifically reference those two, if you will, entities or those two types of possible but not necessarily probable recovery. Finally, if we look at Mr. Morris, did the 2nd and 4th District reject the analysis in Minton? As it's addressed both before this court now and in the appellate court. What they did is they looked at it, I would say, in different contexts and didn't necessarily reject it but simply said that they're not applying it. Among other things, the cases cited by the appellants here, the subcontractors, are raw land sales, which are substantially different than protecting someone's actual home or home ownership. Here, if we actually went the route that the subcontractors are suggesting, what we would do is return the concept of caveat emptor to the purchase of a home in Illinois. And I would suggest to the court that that is nothing that Illinois policy or decisions or legislation has looked to do. The Minton decision in 1985 logically extended this court's decision in Radarowitz and otherwise with the policy considerations that we must protect Illinois home buyers and homeowners. Minton, followed by Washington Court, followed by the Dearlove Cove, filed by the Pratt 2 and the Pratt 3 decisions, all looked at solvency. Solvency is not something new. It is not something that was first created by the appellate court in this matter. Moreover, privity of contract, which was talked about, is a construct that should have and does have no bearing in this case. Privity has been eroded by a barter recovery through both court decisions as well as legislation in Illinois. But moreover, it's practically irrelevant in this situation. And the question is why. Why? Because, as we noted just a few moments ago, the contractors do not have simply no relationship. They certainly are not surprised by the fact that they're building a home. They aren't doing it just for practice. They're building it for a homeowner that will move into that home. There's no support. Doesn't the economic loss rule preclude characterizing the warranty claims as tort claims? It would preclude them being a tort claim but not necessarily a tort-like claim. The economic loss doctrine says, as the court is aware, as Justice Heist suggested, this is an action that arises initially out of contract. So it is based essentially on the underlying contract. So even this court has found that because the warranty is contract-like, Mormon should not and does not apply here. Mormon would apply if it was simply a negligence case or a case such as that. And that's not what we have here. What we have here instead — Could you take us a couple steps back there? You said this court has decided the proposition you just said. Where is that coming from? What case are you talking about? We have to go back first. If we go back to the original cases ruled by this court where Darwitz, Peterson, et cetera, we looked to looking at what gave rise to the warranty of habitability. Warranty by its very nature is a contract-like claim. So I would submit to the court that when looking at its prior decisions in such cases as that, it came from the genesis of a contract-like claim. Is there direct privity? The answer is, of course, no, there is not direct privity. I understand it's either a tort-like claim or a contract-like claim. Which is it, tort or contract? It's a contract claim. But what we've done is we've cited the tort — But not like a contract. No, it — Is it something different? There's no privity of contract, if that's really the question, because there's certainly not a signed writing between the homeowner and the subcontractor. But because it arises in the context of the purchase and sale agreement, it is from a contract. When we cited the tort law or the tort cases, that was really for the proposition that Illinois policy, even in tort law, looks for relative culpability. And the reason we say that is, in this case with contracts, there is no attempt, I would submit, by Siena Court Condominium or, quite candidly, other plaintiffs in this situation, to say a subcontractor should be responsible for defects beyond those that they created, which is kind of a tort concept that you're responsible for yourself. That's also the same concept. So is there a duty? Pardon me? Is there a tort duty? There's really not necessarily a tort duty. I think it's just that — Well, then it's not a tort. It's not a tort, but it's a good analysis or a good analogy to look at. Because in tort, we look at relative culpability. Contract, we also look at what is the approximately caused or the legally caused damages from your breach. Here, that breach would be a defective type of construction. And we're only looking to have a subcontractor be responsible for that which the subcontractor is defective. And that's an important point because we have heard the subcontractors say, well, we have no way of limiting or somehow putting a cap on our liability. And the answer is, yes, of course you do. Do not perform defective work. It should be the subcontractor who can perform the work in a way, not the innocent home buyer that we should rely upon to figure out was it defective or not. Moreover, it's immaterial. Who do they share that with? In other words, if you have a contract, you have two parties to the contract. Who do they share that with? They share that with not only themselves because they have to perform proper work. There are other subcontractors. So if someone else did something else wrong, that person is responsible. And that's an important point here that even if you have a fully solvent, fully available as a defendant general contractor, if the homeowner sues the general contractor, the general contractor under our civil procedure has the ability to third party that subcontractor in on their defective work. Here, if you have an insolvent general that you cannot go against, if the homeowner goes directly against the subcontractor, they're defending exactly the same defect suit. So you have it in either case. But when the contractor contracts with the subs, they have the ability to limit their liability in that contractual relationship. There is no privity of contract with the homeowner. So that's what I mean about who are they? How could they in any way limit their liability? It wouldn't be a contractual limitation. It would be the limitation by doing appropriate work. If they felt they then had a cause of action against this general, they could sue the general if that would be a possibility. And that's really the problem here is it's not a possibility. What has happened, I believe, through the suggestion of the subcontractors is to conflate the case. Take it to the pleading stage. Not pleadings, but let's go to the end of the case where we already have an adjudicated judgment and we're seeking to collect and do post-judgment proceedings. Recourse is nothing but another word for can you recover or recoverability. And under Illinois law, we have always done that after the case. I am personally aware and not aware that anyone else knows of another Illinois cause of action where you look up front to can you recover your judgment. That is always at the end. The subcontractors, by urging recourse, are saying, let's look at the beginning of the case before we have an adjudication of liability, before we have an adjudication of damages, and before we have something we can do post-judgment proceedings on, and let's decide whether you have recourse, i.e., can you recover that judgment. That cannot and should not be the law of Illinois, as it is not in any other cause of action. Mr. Morris? Mr. Morris, the homeowner always has a cause of action. It doesn't mean that the court has actually failed them to provide a remedy. So a bankrupt defendant is always something that every civil litigant might face. So you're trying to go around an end here that something that happens in every situation. The differences in other situations is that we're not dealing with homeownership, and we're not dealing with the strong public policy we have in Illinois to protect Illinois homeowners. And what we're really looking at is an innocent homeowner. There's no culpability on the homeowners' part. Well, other civil litigants are innocent as well, but if there's a bankruptcy involved, it's the way it is. That could be the case, but as I've said before, since 1985, from the Minton decision, that ability to go there has not been challenged by either legislation or by this court. And I would submit that that's the appropriate, if you will, conclusion that should be here, to have that protective veil over the homeownership of Illinois homeowners. Because to otherwise say you can't do that, what you do is you leave a homeowner without any really effective recovery, and that's really what's inappropriate in this case. But you're asking the court to use a contract-like situation or a tort-like situation. But what do we do with actual tort law and contract law when writing an opinion? In tort law, Illinois law does permit you many times to go around. A good example is through the retailer statute, that if a manufacturer, a retailer, you can go against the retailer if the manufacturer ultimately cannot pay. So there are other examples where we have adopted this. And in this very important example, I would submit that it should also be confirmed by this court. It's not a question, I don't think, under the 308 questions that were submitted to the appellate court as to whether Minton should or should not be the law. The only question is whether, really, I think, should it be recourse or insolvency. And I would submit to the court that insolvency is a known test and a test that we can actually apply. And the first district actually concluded that it is the test that is simpler to apply. Recourse, as I indicated, would be taking the end of the case and putting it at the pleading stage, which would not be appropriate. Mr. Morris, this was interesting to me in the briefs. It seems like it's two sides of the same coin. You mentioned public policy. Subcontractors say, as a practical matter, expanding liability under the employed warranty of habitability to subcontractors whenever a purchase is without recourse to the developer or whenever the developer is insolvent allows developers to escape liability by structuring a single-purpose entity designed to remain solvent only until the project is complete. And then you say, without the narrow extension of liability under Minton, the builder general contractors would be encouraged to set up their businesses as single-purpose entities that divest themselves of assets at the conclusion of construction projects. The builder general contractor would be encouraged to cut costs and be careless in the construction because no matter what the outcome, the builder general contractor and subcontractors would walk away with huge profits, dot, dot, dot. Is that two sides of the same coin? And if so, why is your position correct from a public policy perspective? It is most likely two sides of the same coin, but it's a very big and very expensive coin to Illinois homeowners, obviously. And why is what I submit, Mike, is the proper one? I guess the first thing is I said it, but that's probably not enough. But the reason it's there is if we look back to the public policy, if we do not do, as we suggest, affirm the ability to go against the subcontractor, what we do is we leave the innocent home purchaser. We kind of have left aside in this argument, they didn't do anything wrong without any kind of recoverability for their home's defects. The burden should not be on that individual. The burden should be on the person who performed effective work. Again, if the subcontractor did not perform effective work, even if the general contractor is insolvent and someone else performed effective work, they're not liable. They're only liable for their defective work. So as a consequence, what we would do under this public policy support is we would support the notion that a subcontractor who does defective work, when there is an insolvent general contractor, there would be a remedy against that subcontractor because of that subcontractor's work, rather than, as suggested by the subcontractors, have caveat emptor be effectively a bar to extinguish all liability and therefore the innocent home buyer receives nothing. Since we're talking about public policy, certainly the position you take would affect the home construction industry where subcontractors who agree to work on a project that is clearly a single-based project in terms of like this one, set up only to do this project. If it works, great. If it doesn't work, insolvent. Then under your theory, subcontractors would have to be very cautious entering into those kind of contracts with that kind of general contractor, correct? That would be correct and that would actually be a good thing. And would it shift costs in some way? Does it change the relationship between the subcontractor and the developer? Would it shift costs? It might. And if it does shift costs, that's an interesting economic question. Should there be a shifting of costs to say, I can do it less and give you defective work, but now since I know I might get sued, I should pay more because I'm not going to do defective work. The policy should be not to encourage. And I think your specific, Justice, suggestion is that they've put their prices in such a way that, well, we'll do more defective work here because we're going to be insulated, but if we're not, oh, we better do it right. Here, I think the public policy of Illinois should be it should be done right for that home buyer. There should not be a question of can I and can't be sued, and if I can be sued, uh-oh, I better do something different. So as a consequence of that, I submit to the court that, yes, there could be an effect, but that would be a positive effect for Illinois. Well, there always could be an action by the general against the sub, though, right? Yes, that's correct. So this idea that, hey, I'm going to give you a bid based on defective work versus good work, I mean, does that really hold water when they still have to do it, you would presumably should do it, do good work, and avoid the general coming after it? Right. It would only arise in a situation where the general specifically was going to disappear, so to speak, at the end of the project. But otherwise, you're right. The subcontractor would certainly be amenable to a third-party action by the general if the general was sued by the homeowner, which is the exact action other than the plaintiff name that the homeowner would do against the sub in effect if there was an insolvent or a general that was not there. So there really is no difference as it relates to that. Counsel, other than Connecticut, that based their extension of the warranty based on the statute, is there any other state that has extended the warranty? Statutorily, I'm not aware of any other state that's done it. Illinois, of course, as we know, at least from the Minton case and through certain cases of this court since 1985, has had an extension such as this. Other states have other types of, if you will, liabilities. Like, for instance, in New Jersey, though it's not in the briefing, in a home case, if within a year you have any kind of defect, you can immediately have an arbitration actually at the home, wherever the defect is. So there's other, if you will, variations on a theme. But specifically as relates to this, no. The answer is really just that one case or that one statute. What we suggest. Could I suggest this? Yes. Is this an issue the legislature should deal with in terms of the balancing of all of these issues? It's either an issue the legislature should deal with or it's an issue the legislature has dealt with by not acting. And seeing that since 1985, this has been the law, seeing that the Pratt case has been decided and they didn't come in and say, let's change it, let's make something different. So it's either a legislative question or it's a question that we can say the legislature has already, by not passing something new, said we're happy with the situation. There's no reason to change the situation. What we would submit to the court is that both the trial court as well as the first district, quote, unquote, got it right. The suggestion that there's a difference with material suppliers and with design professionals, quite candidly, we would agree that there should not be that distinction. But that's not before this court. What is before this court really comes up on the four certified questions. And under those four certified questions, we submit that a subcontractor should not enjoy, especially at the expense of Illinois homeowners, complete immunity from the consequences of its own defective work just because there's a lack of privity with the home buyer. Moreover, even if there is recourse, the question of recourse should not be at the pleading stage of the case. And the suggestion that if you have minimal assets, there could still be solvency does not look at what the test of solvency is. It's not do you have a dollar, it's do your assets, are they exceeded by your liabilities. Here, if we start looking at recourse, we'd have to ask the question, what about that company that has $1 amenable to collection? Is that enough? Is that enough to protect our home buyers? I'd submit the answer should be no to that question. And those are more difficult questions than having the court at a trial level, at a pleading stage, determine is there solvency. Thus, the decades long, since 1985, Minton decision as well as the subsequent decisions primarily in the First District should be upheld that a subcontractor is liable if the general contractor is insolvent and the subcontractor performed defective work. And we do that to protect Illinois home buyers. Illinois home buyers' expectations in the American dream. Thank you. Thank you, Mr. Morris. Reply. Just three points that I want to touch on briefly and reply. First, very briefly, the Connecticut statute to which counsel referred does not in fact expand the implied warranty of habitability to subcontractors. He's citing to a Connecticut building code warranty, which is a separate portion of the Connecticut statute. There's a separate warranty of habitability statute that does not on its face expand liabilities to subcontractors. And I found no case law extending it to subcontractors. Counsel raised the point that in an ordinary action, where the general contractor or the builder is still solvent, the home buyer can sue the general and then the general can bring in the subcontractors by third party. I think it's important to focus on what the claim the general contractor has against the subcontractor is. The general contractor's third-party claim against a subcontractor  is not based on the contract for sale between the builder and the home buyer. They're not bringing claims based on the implied warranty. They're bringing separate contract claims, and it's completely distinct. Finally, turning to the public policy issue, I did on that the general contractor claims want to point out that in this record, this plaintiff has, in fact, brought claims against the general contractor and developer in this very case. They're on the one hand arguing that they should be allowed to go against subcontractors because the general contractor and the developer are insolvent or cannot provide recourse, while at the same time, in fact, pursuing recourse from the general contractor and the builder. They want to have their cake and eat it, too, so to speak, by being able to do two things at the same time. As for the public policy issue, I think we're probably all in agreement here, opposing counsel as well, that a big part of the problem that the plaintiff is facing here arises from this developing trend of developers and builders to form these limited-purpose LLCs. So they form a limited-purpose LLC, finish the project, dissolve, leaving the new homebuyer potentially without recourse or with an insolvent general contractor or developer. And I'm sympathetic to the position that may leave new homebuyers in, but that's not a justification for imposing, effectively out of thin air, a duty on subcontractors who aren't party to a contract with these homebuyers. They're not involved in establishing that relationship. They're effectively being penalized for being stable, longstanding entities that, you know, they continue on in existence after the project's done. And under the Minton Rule, they're then going to be stuck with the liability of a builder or developer simply because the builder or developer has decided to structure in a way to effectively attempt to evade liability. I think, you know, perhaps for another day what the solutions to that problem are. I think that, you know, there's potentials in piercing the corporate veil and things of that nature. But at the end of the day, it's not a justification for imposing new liability on subcontractors. If the Court has no further questions for me, I would urge this Court to overrule Minton, and I will turn it over to Mr. Goodsnyder for the remaining questions. Thank you. Thank you. And briefly, just to address a few of the comments. First off, overruling Minton would not return us to caveat emptor because the homeowner would still have an implied warranty of habitability case against a developer and a general contractor. Counsel refers to repeatedly innocent homeowners, and I think that comes in part from the language of the cases and partly from it makes a sympathetic argument. But we have to look in particular at this particular case. We have these purchases started in the mid-2000s, and we have purchasers and transactions in these two buildings that go on through today. This case was filed in 2013. So we have some purchasers that purchase it during the pendency of the litigation. Additionally, Exhibit 1 to the Third Amendment complaint is an exemplar of the purchase contract between the homeowners and the developer, and Exhibit C to that is a disclaimer of an implied warranty. So all of these homeowners who bought in this building signed off on an express warranty and waived their implied warranty. And I understand the case law says that, essentially, the subcontractors don't get the benefit of this language, and I understand that that's not properly before us. But if we're going to argue about categorizing people as innocent homeowners, essentially these homeowners would stand to be in a better position having the potential implied warranty limitless exposure of the subcontractors having the benefit of having a developer and a general contractor structured in such a way that they go out of business, and by doing so they eliminate their limitation on the written express warranty that they were capped at in the agreement that they signed. Again, we know from the bankruptcy petitions that TR Siena and Roszak filed that they had millions of dollars in liabilities, some of which were attributable to the money that was left owed to the subcontractors on this project. So here we have the worst of all worlds where the subcontractors on this project were left not paid in full, and then as the members of the court understood, they had the limitations of the face value of their contract. They were never getting, no matter how successful the project was, the market went through the roof, they were never getting a penny more than the face amount of their contract. In this case, many of them were left short on their contract and named as defendants in this case. And just to highlight a procedural issue, Roszak ADC, the general contract in this case, was named as a defendant and cross-claimed the subcontractors, and because of an estoppel issue, their case against the subcontractors was dismissed. In a typical case, if they had properly scheduled their claims, they would have contract claims to the extent of their warranties, as the court indicated that they had negotiated with their subcontractors. So again, we'd ask for the court to reconsider Minton and at the worst-case scenario, apply the recourse test and consider the assets available to the plaintiff in this case as available, and that being the test of whether or not they can proceed against the subcontractors. Thank you so much for your time. Thank you. Case number 122022, Siena Court Condominium Association v. Champion Aluminum Corporation, et al., will be taken under advisement as agenda number 12. Ms. Janssen, Mr. Goodsteiner, excuse me, Mr. Morris, we thank you for your arguments this morning. You're excused with our thanks.